IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **BILLY WOODS,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) Case No. 3:18-CV-01161- MAB |
| | ) |
| **ROSE, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

# MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

Plaintiff Billy Woods filed this action under 42 U.S.C. § 1983 alleging various officials at Centralia Correctional Center violated his constitutional rights (Doc. 1). Now pending before the Court is a Motion for Summary Judgment filed by Defendants Travia Rose, Adam Dulle, and Anissa Shaw (Doc. 34). For the reasons set forth below, the motion is denied.

## BACKGROUND

Plaintiff Billy Woods, an inmate of the Illinois Department of Corrections, filed this lawsuit pursuant to 28 U.S.C. § 1983 on May 25, 2018 (Doc. 1). Woods alleges Defendant Dulle violated the Eighth Amendment to the United States Constitution when he acted with deliberate indifference by instructing Woods to use a meat slicing machine despite knowing the substantial risk of serious harm to Woods (*Id*.). Woods also alleges Defendants Rose and Shaw violated the Eighth Amendment when they acted with deliberate indifference to his serious medical needs (*Id*.).

On September 9, 2017, Woods was working at his job in the Dietary Department, when his supervisor, Dulle, instructed Woods to operate the meat slicing machine (Doc. 35-1, p. 22). Woods told Dulle that a wheel was missing from the machine, and it may not work properly (*Id.*). Instead of instructing Woods to use a different tool to cut the meat, Dulle told Woods to put pressure on the machine with his right hand to hold it in place (*Id.*). While using the machine, at around 1:40 p.m., it jumped and cut off the top portion of Woods's little finger on his left hand. (Doc. 1, p. 11; Doc. 35-2, pp. 19-20). Dulle allowed Woods to go immediately to the Health Care Unit ("HCU") (Doc. 35, p. 3).

Around 1:42 p.m., Woods arrived at the HCU and explained to Defendant Shaw that he cut part of his finger off, which was causing blood to squirt out (Doc. 35-1, p. 23). Shaw is a Correctional Medical Technician ("CMT") and evaluates patients that request to be seen for nurse sick call and in the infirmary (Doc. 37-1). Shaw told Woods to calm down and it is not as bad as Woods believed (Doc. 35-1, p. 23). She then told Woods to take his hand off the finger to allow her and other staff to examine (*Id.*). Immediately upon releasing the pressure, blood started squirting out, which caused staff to jump back (*Id.*).

After seeing the seriousness of Woods's injuries, Shaw spent around five minutes weighing her options on what she was going to do (*Id.*). Around that time, another inmate brought the severed part of Woods's finger to the HCU (*Id.*). Woods then asked Shaw if she could sew it back on or send Woods to a hospital (*Id.*). Shaw responded by calling Correctional Officer Rose, explaining Woods's injuries to Rose, and sought clearance to

send Woods to an outside hospital (*Id.*).¹ After the conversation, Shaw returned to Woods and explained that Rose denied referring Woods to an outside hospital because it was not a medical emergency (*Id.*). Shaw then threw away the severed part of Woods's finger (Doc. 1, p. 23). Shaw never called a doctor during this visit (Doc. 35-1, pp. 29-30; Doc. 35-2, p. 20). Instead, Shaw had Woods place the remaining finger in saline and peroxide to stop the bleeding (Doc. 1, p. 11). Shaw then bandaged Woods's finger and sent him back to the Dietary area (Doc. 35-1, p. 28).

When Woods arrived back in Dietary, Dulle told Woods that he could go back to his housing unit (*Id.*). Woods was waiting on the count check when another officer in the tower noticed that blood was dripping down again through the gauze (*Id.* at p. 30). The officer contacted Sergeant Boyle, who examined the injury and escorted Woods back to the HCU (*Id.*; Doc. 35-2, p. 2).

Woods went to the HCU a second time around 3:30 p.m.—which was 30 minutes into a new shift (Doc. 35-2, p. 2; Doc. 35-4). Following Shaw's course of treatment,² the new nurses took off the bloody gauze, cleaned Woods's injury with water, and reinforced it with more gauze (Doc. 35-1, p. 31; Doc. 35-2, p. 2). Woods then returned back to his housing unit (Doc. 35-1, p. 32).

---

¹ Defendants contest this fact. After Woods filed a grievance concerning this incident, Grievance Officer Susan Walker explained that the nursing staff called a physician, not Rose (Doc. 1, p. 23). Not only does Woods's testimony dispute this, but also the Offender Injury Report indicates that a physician was not contacted (Doc. 35-2, p. 20). Further, the Offender Outpatient Progress Notes from September 9, 2017, at 1:42 p.m., includes plans on when an inmate is referred to a doctor on the same day of the injury (Doc. 1, p.11). If no doctor is referred, medical professionals must follow certain protocols which include cleansing the laceration with mild antiseptic soap and using saline (*Id.*).
² Shaw's shift ended at 3:00 p.m. (Doc. 35-4, p. 3).

Anywhere from an hour later to around 9:00 p.m.,[3] Woods went to the HCU a third time because he was bleeding through the gauze (*Id*. at pp. 32-34; Doc. 1, p. 20; Doc. 35, p. 4). Potentially two more times, Woods's fourth and fifth visits to the HCU, Woods was evaluated by medical staff, but the bleeding did not stop (Doc. 1, p. 20; Doc. 35-1, p. 35).[4]

Sometime on September 10, 2017, while heading to the HCU again[5] Sergeant Boyle stopped Woods and called Major McAbee because Woods was still bleeding (Doc. 1, p. 21; Doc. 35, p. 35). Major McAbee looked at Woods's hand, asked what had happened, and immediately called the warden (*Id*.). The warden called the Director of Nurses, Knebel, to examine Woods's finger (*Id*.). Upon review, the Director of Nurses determined that emergency medical treatment was necessary, and Woods was rushed to the hospital, where he received treatment (Doc. 1, p. 21; Doc. 35-1, p. 37; Doc. 35-2, p. 3).

At the hospital, the medical records note that Woods suffered throbbing pain and uncontrolled bleeding (Doc. 1, p. 14). The medical professionals at the hospital, however, were able to stop the bleeding later that night on September 10, 2017 (Doc. 1, p. 16; Doc. 35-1, p. 37).

## LEGAL STANDARD

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

---

[3] According to Woods's grievance, he arrived to the HCU a third time at 9:00 p.m. (Doc. 1, p. 20). At his deposition, however, Woods testified that it was an hour or so later (*Id*. at pp. 32-34).

[4] Either at 9:00 p.m. on September 9, 2017, or at 1:00 am on September 10, 2017, Woods went to the HCU a fourth time (Doc. 1, p. 20; Doc. 35-1, p. 35). Woods went to the HCU a fifth time at either 1:00 a.m. on September 10, 2017 (Doc. 35-1, p. 35), or at a later time (Doc. 1, pp. 20-21).

[5] Woods's medical records do not provide any details of the third, fourth, or fifth visits. Instead, after Woods's second visit on September 9, 2017 at 3:30 p.m., the next recorded visit was September 10, 2017, at 6:20 p.m. (Doc. 35-2, p. 2).

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of establishing that no material facts are in genuine dispute; any doubt as to the existence of a genuine issue must be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970); *Lawrence v. Kenosha Cty.*, 391 F.3d 837, 841 (7th Cir. 2004).

Once the moving party sets forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 232-24 (1986). The party opposing summary judgment must offer admissible evidence in support of his version of events; hearsay evidence does not create a genuine issue of material fact. *Durling v. Menard, Inc.*, 2020 WL 996520, at *2 (N.D. Ill. Mar. 2, 2020) (citing *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 484 (7th Cir. 1996)). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the non-movant. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[i]nferences that rely upon speculation or conjecture are insufficient." *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial." *Id.* (citation omitted).

### DISCUSSION

The Eighth Amendment prohibits cruel and unusual punishments, and deliberate

indifference to the "serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009). To succeed on an Eighth Amendment deliberate indifference claim, a plaintiff must show: (1) that he suffered from an objectively serious medical condition; and (2) that the individual defendant was deliberately indifferent to that condition. *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (citing *Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006)).

A medical condition is objectively serious if "'a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson.'" *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) (quoting *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir. 2014)). It is not necessary for such a medical condition to "be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010); *accord Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (violating the Eighth Amendment requires "deliberate indifference to a *substantial* risk of *serious* harm") (internal quotation marks omitted) (emphasis added).

Prevailing on the second prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *Id.* at 653. A plaintiff need not show the individual "literally ignored" his complaint, but that the individual was aware of the condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). "Something more than negligence or even malpractice is required" to prove deliberate indifference. *Pyles v.*

*Fahim*, 771 F.3d 403, 409 (7th Cir. 2014); *see also Hammond v. Rector*, 123 F. Supp. 3d 1076, 1086 (S.D. Ill. 2015) ("isolated occurrences of deficient medical treatment are generally insufficient to establish . . . deliberate indifference"). Deliberate indifference involves "intentional or reckless conduct, not mere negligence." *Berry*, 604 F.3d at 440 (citing *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)).

A prisoner is entitled to "reasonable measures to meet a substantial risk of serious harm"—not to demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). A prisoner's dissatisfaction with a medical professional's prescribed course of treatment does not give rise to a successful deliberate indifference claim unless the treatment is so "blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) (quoting *Thomas v. Pate*, 493 F.2d 151, 158 (7th Cir. 1974)).

## I. Defendant Adam Dulle

Woods brings an Eighth Amendment deliberate indifference claim against Dulle for ordering Woods to operate a defective meat slicing machine, which cut off part of Woods's finger. Dulle has moved for summary judgment on the grounds that there is no evidence that he knew there was a defect with the machine such that it would harm Woods. To support this argument, Dulle relies on an unsworn declaration, pursuant to 28 U.S.C. § 1746. The unsworn declaration, however, is deficient in two respects. It is undated, but more importantly, it is lacking critical language affirming that the facts in the declaration are true and correct. *Compare* Doc. 37 *with* 28 U.S.C. § 1746 (stating, in pertinent part, that the declaration must state the following: "I declare (or certify, verify,

or state) under penalty of perjury that the foregoing is true and correct. Executed on (date)."). This affirmation by the declarant that facts are true and correct is especially important when it is an unsworn declaration. Although reluctant to consider the declaration because of these deficiencies, the Court will nevertheless do so.[6]

Setting the deficiencies aside, Dulle's declaration simply demonstrates that a genuine issue of material fact remains regarding Dulle's knowledge of a defect with the machine such that it would harm Woods (Doc. 35, p. 22). Dulle states he had no knowledge that there were any defects on the meat slicing machine on September 9, 2017 (Doc. 37-1). He does not cite to any documentary evidence that would corroborate his testimony such as inspection records showing the machine had been inspected prior to that date and deemed in working condition. Woods, meanwhile, says he told Dulle that the wheel on the machine was missing and it may not work properly (Doc. 35-1, p. 22). After learning that the machine was missing a wheel, Woods says that Dulle told him to simply apply pressure on the machine with his right hand to hold it in place (*Id.*). While using the machine, at around 1:40 p.m., it jumped and cut off the top portion of Woods's little finger on his left hand. (Doc. 1, p. 11; Doc. 35-2, pp. 19-20).

Dulle has not objected to Woods's testimony or argued that his story cannot be

---

[6] Defendants Travia Rose and Anissa Shaw also submitted unsworn declarations, pursuant to 28 U.S.C. § 1746 (Docs. 35-3 (Rose) and 37-1 (Shaw)). Each declaration suffers from the same deficiencies as Dulle's. The declarations are undated and lack the critical certification that the facts attested to are *true and correct*. *Compare* Docs. 35-3; 37-1 *with* 28 U.S.C. § 1746. Although each declarant states under penalty of perjury that they have personal knowledge of the facts, an affirmation that the facts are true and correct is essential and the absence of that language is conspicuous. This deficiency is not insignificant and the undersigned is reluctant to categorize it as a procedural technicality given that this is what every witness must swear to before giving testimony (that their testimony is the truth, the whole truth, and nothing but the truth). But courts generally prefer to resolve disputes on their merits instead of procedural technicalities and so the Court will consider each.

presented in a form that would be admissible in evidence. *See* FED. R. CIV. P. 56(c)(2); *McGee v. Macon Cty. Sheriff's Dep't*, 2020 WL 4464707, at *13 (C.D. Ill. July 20, 2020). Indeed, any statements made by Dulle to Woods are not hearsay, as they constitute an opposing party's statement. FED. R. EVID. 801(d)(2)(A). And the statements that Dulle made to Woods could be admissible as non-hearsay, to show the effect the statements had on Woods. That is, the statements could be used—not to prove that Dulle knew there was a defect—but to show why and how Woods used the machine, only to cutoff part of his finger.

Without a proper objection that Woods's testimony cannot be presented in any admissible form, the Court finds Woods's testimony to be competent summary judgment evidence creating a genuine issue of material fact for trial. *See Lewandowski v. City of Milwaukee*, 823 F. App'x 426, 428–29 (7th Cir. 2020) (noting that a district court "cannot consider inadmissible hearsay, *over proper objections*, in deciding summary judgment") (emphasis added). Dulle's declaration and Woods's testimony presents a classic swearing contest on a critical issue, which means summary judgment is not appropriate. Indeed, if a jury were to credit Woods's testimony, it could reasonably find that Dulle knew there was a defect with the machine such that it would harm Woods.

For these reasons, the Court finds that Defendant Dulle is not entitled to summary judgment.

## II. Defendant Travia Rose

Woods brings an Eighth Amendment deliberate indifference claim against Rose for denying permission to be sent to an outside hospital for treatment at the request of

nursing staff. Rose agrees that Woods suffered a serious medical condition, but Rose argues she was not deliberately indifferent to Woods. Rose notes that "[Woods] named [her] in this lawsuit because he believes [she] refused to send him to a hospital" (Doc. 35, p. 13). Rose argues that she did not speak to Woods on September 9, 2017 (*Id*. at 4) and provides an affidavit noting that her shift did not start until after the injury took place (Doc. 35-3).

It is completely irrelevant whether Rose personally spoke to Woods. Rather, if an official has knowledge of an excessive risk to the inmate's safety or health, "refusal or declination to exercise the authority of his or her office may reflect deliberate disregard." *Perez v. Fenoglio*, 792 F.3d 768, 781–82 (7th Cir. 2015) (citation omitted). "In other words, prisoner requests for relief that fall on 'deaf ears' may evidence deliberate indifference." *Id.* (citation omitted). Woods does not have to prove that his complaints were "literally ignored," but only that "the defendants' responses to it were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008) (citing *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) (citation omitted)).

Non-medical defendants, like Rose, can rely on the medical judgment of medical personnel. *Greeno,* 414 F.3d at 655-656. But Rose "cannot simply ignore an inmate's plight." *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011). If Rose received communication "in its content and manner of transmission, gave the prison official sufficient notice to alert him or her to 'an excessive risk to inmate health or safety,'" she

can be found to be deliberately indifferent to Woods's serious needs. *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996) (quoting *Farmer*, 511 U.S. at 837).

Here, in Rose's declaration, she states that "[she] was informed Mr. Woods was still having a medical issue with his finger and ensured he returned to the health care unit for further treatment" (Doc. 35-3).[7] According to Rose, "[t]he initial injury occurred on the previous shift and [she] was given no information regarding the injury when [she] began [her] shift" (*Id.*). Rose continues noting that "[she] communicated with the nursing staff on duty about the nature of his injury and was given no information that would lead [her] to believe that Mr. Woods required any extensive treatment other than what was being done for him at the facility" (*Id.*).

Woods's testimony and other evidence available, however, create a genuine issue of material fact regarding whether Rose deliberately denied or interfered with Woods being sent to an outside hospital and knew that Woods would be harmed as a result. According to the medical records, Woods reported to the health care unit on September 9, 2017, around 1:42 p.m. (Doc. 35-2, pp. 19-20). Rose was at the Centralia Correctional Center around 2:09 p.m. (Doc. 35-4, p. 2). Shaw did not sign out until 3:00 p.m. (*Id.* at p. 3). These facts support Woods's testimony that Shaw called Rose, explained Woods's injuries to Rose, and sought clearance to send Woods to an outside hospital (Doc. 35-1, p. 23). Based on Woods's testimony, Rose had actual knowledge of Woods's injuries and still denied Shaw's request to send Woods to a hospital or did not properly communicate

---

[7] Rose's declaration is an unsworn declaration pursuant to 28 U.S.C. § 1746 (*See* Doc.35-3). As outlined *supra*, this declaration is deficient in certain respects, but the Court nevertheless considers it. *See supra* pp. 7-8 and FN. 6.

Woods's injuries to those able to make the decision (*Id.* at pp. 23, 28-29).[8]

Like Dulle, Rose has not objected that Woods's testimony cannot be presented in a form that would be admissible in evidence. *See* FED. R. CIV. P. 56(c)(2); *McGee*, 2020 WL 4464707 at *13. Without a proper objection that Woods's testimony cannot be presented in any admissible form, the Court finds Woods's testimony to be competent summary judgment evidence creating a genuine issue of material fact for trial. *See Lewandowski*, 823 F. App'x at 428–29. If a jury were to credit Woods's testimony, it could reasonably find that Rose knew the seriousness of Woods's injuries and she unreasonably denied Woods from being sent to the hospital.

Accordingly, the Court finds that Defendant Rose is not entitled to summary judgment.

### III.   Defendant Anissa Shaw

Woods brings an Eighth Amendment deliberate indifference claim against Shaw for failing to properly treat his finger injury and delaying his access to hospital treatment. Shaw argues she was not deliberately indifferent to Woods. Shaw notes that "[she] cleaned [Woods's] wound with saline, gave [Woods] pain medication and wrapped it with gauze" (Doc. 35, p. 13). Shaw continues noting that "[w]hile [Woods] believes the piece of his finger should have been reattached, this is not deliberate indifference" (*Id.*).

Like Dulle and Rose, Shaw also relies on an unsworn declaration, pursuant to 28

---

[8] Indeed, Woods visited the HCU two or three additional times during Rose's shift—after his initial visit and Rose's conversation with Shaw—yet Rose still did not alert the proper personnel to ensure Woods received the proper treatment (Doc. 35-4, p. 2; Doc. 35-1, p. 32-35).

U.S.C. § 1746.[9] Shaw is a Correctional Medical Technician ("CMT") and evaluates patients that request to be seen for nurse sick call and in the infirmary (Doc. 37-1). According to Shaw, when she evaluates patients in the infirmary, she follows a protocol sheet to determine the appropriate treatment to provide to patients (Doc. 37-1). Shaw further noted that she does not have the authority to order patients to an outside hospital, but may provide medications to patients as prescribed by a physician or listed in the protocol sheets (*Id.*). However, Shaw *does* have the authority to refer a patient to a medical doctor or nurse practitioner for further evaluation (*Id.*).

Like doctors, nurses can be deliberately indifferent if they "knowingly disregard a risk to an inmate's health." *Perez*, 792 F.3d at 779 (citing *Berry*, 604 F.3d at 440). For a medical professional, like Shaw, to be held liable under the deliberate indifference standard, he or she must respond in a way that is "so plainly inappropriate" or make a decision that is "such a substantial departure from accepted professional judgment, practice, or standards," that it gives rise to the inference that they intentionally or recklessly disregarded the prisoner's needs. *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) (quoting *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008) (citation omitted)). In other words, a prison medical professional is "entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (citation omitted).

---

[9] *See supra* at pp. 7-8 and FN 6 for the Court's analysis regarding certain deficiencies in the unsworn declaration but the Court's decision to nevertheless consider the facts contained in each.

Viewing the facts in the light most favorable to Woods, Shaw disregarded the potential severity of Woods's finger injury in light of part of his finger missing, the amount of bleeding, and his pain (Doc. 1, p. 11). In addition, by failing to refer Woods to a doctor or nurse practitioner for further evaluation, there is a genuine issue of material fact as to whether Shaw unnecessarily delayed treatment that aggravated his condition and contributed to unnecessary pain. *See e.g., Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007) (finding plaintiff's allegations of a two-day delay of proper treatment for an openly dislocated finger, which caused unnecessary pain and disfigurement, was enough to state a claim for deliberate indifference). Woods notes that Shaw had the authority to refer him to a physician, but she did not (Doc. 41, p. 4). This is further supported in Woods's medical records (Doc. 35-2, p. 20).

Ultimately, if a jury were to credit Woods's testimony, it could reasonably find that Shaw was deliberately indifferent in failing to properly treat Woods's finger injury and delayed his access to hospital treatment. Accordingly, Shaw is not entitled to summary judgment.

### IV. Sovereign Immunity

Under the Illinois State Lawsuit Immunity Act, the State of Illinois shall not be made a defendant in any Court except as provided in the Public Labor Relations Act, the Court of Claims Act, the State Officials and Employees Ethics Act, and Section 1.5 of the State Lawsuit Immunity Act. 745 ILL. COMP. STAT. 5/1. When a case is "sounding in tort" the Court of Claims Act vests exclusive jurisdiction. 705 ILL. COMP. STAT. 505/8.

Here, Defendants are not entitled to sovereign immunity. Woods is neither suing

the State of Illinois nor bringing claims for state law torts. Instead, Woods is bringing claims against employees of the State as individuals for violations of his constitutional rights. Even if the Court construed this action as being one against the State, "[t]he doctrine of sovereign immunity affords no protection, however, when it is alleged that the State's agent acted in violation of statutory or *constitutional law* or in excess of his authority." *Leetaru v. Bd. of Trustees of Univ. of Illinois*, 32 N.E.3d 583, 595 (Ill. 2015) (emphasis added). "This exception is premised on the principle that while legal official acts of state officers are regarded as acts of the State itself . . . when a state officer performs illegally or purports to act under an unconstitutional act or under authority which he does not have, the officer's conduct is not regarded as the conduct of the State." *Id*. at 596; *accord Murphy v. Smith*, 844 F.3d 653, 658–59 (7th Cir. 2016).

To overcome this, Defendants argue that Woods's Eighth Amendment claims could be viewed as simple negligence claims (Doc. 35, p. 11). The Court has already completed its threshold review and did not view these as simple negligence claims. If it did, the Court would have dismissed them, like the claims against Nurse Brewer, Jane Doe Nurse #3, and Jane Doe Nurse #4. *Woods v. Rose*, 2018 WL 3094124, at *5 (S.D. Ill. June 22, 2018). More importantly, Woods alleged that all Defendants violated the Eighth Amendment and the evidence in this case establishes genuine issues of fact as to whether Rose and Shaw were deliberately indifferent to Woods's serious medical needs in violation of the Eighth Amendment. Further, the evidence in this case establishes a genuine issue of fact as to whether Dulle was deliberately indifferent to the substantial risk of serious harm for ordering Woods to use a defective meat slicing machine.

Defendants attempt to construe Woods's Eighth Amendment claims as negligence claims is unconvincing, and, accordingly, state sovereign immunity does not bar the claims.

## V.     Qualified Immunity

Similarly, Defendants are not entitled to qualified immunity. "Generally, qualified immunity protects government agents from liability when their actions do not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hernandez v. Cook Cnty. Sheriff's Office*, 634 F.3d 906, 914 (7th Cir. 2011) (citing *Purvis v. Oest*, 614 F.3d 713, 720 (7th Cir. 2010)). "It protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). In determining whether Defendants are entitled to qualified immunity, the Court must ask two questions: "(1) whether the facts, taken in the light most favorable to [ ] [Woods], show that the defendant[s] violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Hernandez*, 634 F.3d at 914 (quoting *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008) (citations omitted)).

Defendants first argue that "the facts alleged do not give rise to a constitutional violation as analyzed in the previous sections" (Doc. 35, p. 14). At the risk of being redundant, this Court disagrees, and the constitutional violations turn on the same genuine issues of material fact that the Court has already discussed.

Next, Defendants argue that they are entitled to qualified immunity because "Defendants could not have known that they might be liable because the slicer was

missing a leg or because [Woods] was not sent to the hospital soon enough or because the small piece of the finger was not saved for reattachment" (*Id*. at p. 15). Defendants' attempts to narrowly construe Woods's claims fail. In 2017, it was clearly established that "[u]nsafe prison working conditions can constitute an Eighth Amendment violation." *Norris v. Cohn*, 27 F. App'x 658, 660 (7th Cir. 2001) (citing *Bagola v. Kindt*, 131 F.3d 632, 646 (7th Cir. 1997)). It was also clearly established that failing to summon medical care for a serious medical condition violates the Eighth Amendment. *See Reed v. McBride*, 178 F.3d 849, 854 (7th Cir. 1999).[10] Finally, "[i]t has been established for decades that prison physicians violate inmates' constitutional rights when they deliberately disregard an inmate's serious medical condition, and only a trial can resolve the facts that are in dispute." *Hayes v. Snyder*, 546 F.3d 516, 528 (7th Cir. 2008). The same goes for nurses. *Walker v. Benjamin*, 293 F.3d 1030, 1040 (7th Cir. 2002); *cf. Williams v. Liefer*, 491 F.3d 710, 716 (7th Cir. 2007) (finding that prison officers were actionable where medical records showed it unnecessarily prolonged plaintiff's pain and high blood pressure); *Gil v. Reed*, 381 F.3d 649, 662 (7th Cir. 2004) (hours of needless suffering can constitute harm).

Accordingly, Dulle, Rose, and Shaw are not entitled to qualified immunity.

## CONCLUSION

For the reasons stated above, the Motion for Summary Judgment filed by Defendants Adam Dulle, Travia Rose, and Anissa Shaw (Doc. 34) is **DENIED**. Plaintiff's

---

[10] Further, it was clearly established that interference with prescribed care by those who enforce policies restricting a prisoner's movements is "a well-recognized example of how nonmedical prison personnel can display deliberate indifference to inmates' medical conditions." *McDonald v. Hardy*, 821 F.3d 882, 890 (7th Cir. 2016). Again, there is a genuine issue of fact of whether Rose deliberately denied or interfered with Woods from being sent to an outside hospital though Shaw made a request to Rose.

motion for status, which asks for a status update on the issue of summary judgment (Doc. 50) is **DENIED as MOOT**. As the Court has previously indicated, the undersigned expresses his sincere apology for the delay in addressing this motion. The delay was due, in large part, to other demands of the undersigned's caseload and the significant disruption caused by the COVID-19 pandemic.

This case shall proceed to trial on the issue of Defendant Dulle, Rose, and Shaw's deliberate indifference to Plaintiff Billy Woods. A status conference will be set by separate order to discuss the utility of scheduling a settlement conference and trial scheduling.

**IT IS SO ORDERED.**

**DATED: November 25, 2020**

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**